**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No._____

ELIZABETH JORDAN,

Plaintiff,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; and U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT,

Defendants.

---

**COMPLAINT AND DEMAND FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

---

Plaintiff Elizabeth Jordan, by and through her attorneys, Aaron Slade and Danielle C. Jefferis of Novo Legal Group LLC, along with associated counsel Gregory Pleasants of Gregory Pleasants Law, APC, hereby submits her Complaint and Demand for Declaratory and Injunctive Relief against the above-named Defendants, and in support thereof states as follows:

## **INTRODUCTION**

1. Melvin Calero Mendoza, a healthy 39-year-old father who loved playing soccer, died suddenly on October 13, 2022, while in Defendants' custody at the Aurora Contract Detention Facility ("ACDF") in Aurora, Colorado. Melvin's family — as any loving, grieving family would do — seeks answers about his sudden death and whatever measure of closure and accountability those answers may bring.

2. To get answers, Melvin's family, through Melvin's sister and personal representative Adilia Calero Mendoza, turned to the Immigration Law & Policy Clinic ("Clinic") at the University of Denver Sturm College of Law, which Plaintiff Elizabeth Jordan directs. The Clinic represents Ms. Calero Mendoza in efforts to investigate the circumstances of Melvin's sudden death, including obtaining records from Defendants, the U.S. Department of Homeland Security ("DHS") and U.S. Immigration and Customs Enforcement ("ICE").

3. Accordingly, Professor Jordan requested under the Freedom of Information Act ("FOIA") three sets of government records regarding Melvin's death: (a) Melvin's custodial medical records, including Defendants' evaluation and treatment (or failure thereof) of the medical conditions that caused his death; (b) the official, headquarters-level OPR Detainee Death Review report generated by ICE Office of Professional Responsibility ("OPR") roughly six months after Melvin's death; and (c) records pertaining to Defendants' efforts in response to the preceding two requests, as well as additional documentation related to Melvin's death.

4. Professor Jordan filed these three requests with Defendants because they are the United States government entities responsible for detaining and providing medical care to Melvin and, as such, create, maintain, possess, and control records responsive to these requests.

5. Professor Jordan filed these three requests with Defendants between March 13, 2023, and May 17, 2023.

6. Yet, as of the date of this filing, and despite FOIA's strict time frames for response, Defendants have failed to produce any records responsive to these three requests.

7. Defendants have responsive records but have failed to produce them or to take any meaningful action toward producing them. Defendants have thereby violated FOIA.

8.  This case is not the first instance of Defendants' failure to comply with FOIA's legal obligations. Indeed, their customs when responding to FOIA requests demonstrate a pattern and practice of FOIA violations, particularly regarding records relating to deaths in their detention system.

9.  Melvin's family, through Professor Jordan, demands answers about Melvin's sudden death; yet one year later, they still have almost no information about it.

10. Accordingly, Professor Jordan asks this Court to declare that Defendants have violated their obligations under FOIA, enjoin such practices, order Defendants to provide records responsive to Professor Jordan's three requests, and thereby help Melvin's family obtain the answers and closure they seek.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

12. Venue lies in this District pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

## PARTIES

13. Plaintiff Elizabeth Jordan is Visiting Professor of Law and Director of the Immigration Law & Policy Clinic at the University of Denver Sturm College of Law. She is a seasoned public interest lawyer and skilled litigator who has spent her career fighting for people with disabilities and defending immigrants' rights.

14. In her present role as Clinic Director, Professor Jordan supervises law students who work under her authority to protect and vindicate the rights of people who are impacted by the

United States immigration detention and deportation system, particularly those people and their families at risk of losing life, freedom, or other fundamental rights under this system.

15. Professor Jordan, by virtue of her significant professional experience, has extensive knowledge of the Defendants' policies and practices on detention and medical care in the detention setting. She regularly represents people in Defendants' custody, including those detained at ACDF, where at least two people have died since 2017 and which has been the subject of rampant complaints of death, abuse, and neglect of those in Defendants' custody. Such complaints concern, among other issues, the provision — or lack thereof — of adequate medical care.

16. Professor Jordan's representation of people in Defendants' custody and subject to Defendants' detention and removal policies and practices require her to regularly invoke FOIA to obtain records pertaining to her clients and their experiences in Defendants' detention facilities, including at ACDF, where Professor Jordan focuses her representation.

17. Defendant U.S. Department of Homeland Security is a federal agency with various responsibilities for protecting the security of the United States. Defendant United States Immigration and Customs Enforcement is a subsidiary component of DHS and is responsible for enforcing federal immigration and custom laws.

18. Defendants and their agents fund, operate, and are legally responsible for a national network of detention facilities where they detain certain individuals who are alleged to lack the legal right to remain in the United States. As such, Defendants are responsible for providing all medical care and treatment prescribed by law for all individuals in their custody.

19. Defendants are "agenc[ies]" within the meaning of 5 U.S.C. § 552(f)(1) and are bound by FOIA. Defendants create, maintain, possess, and control the records responsive to Professor Jordan's three FOIA requests. Defendants, by failing to take any required action with respect to Professor Jordan's three FOIA requests, have violated and continue to violate FOIA.

## FOIA FRAMEWORK

20. "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

21. FOIA requires federal agencies to make government records "promptly available to any person" unless an enumerated exemption applies. 5 U.S.C. § 552(a)(3).

22. FOIA sets forth a specific timeline for responding to a FOIA request. A federal agency must "determine within 20 days (except Saturdays, Sundays, and legal public holidays) after the receipt of any a request whether to comply with such request and shall immediately notify the person making such request of," among other things, "such determination and the reasons therefor." *Id.* at § 552(a)(6)(A)(i).

23. To make such a 'determination,' an agency "must at least (i) gather and review the documents; (ii) determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform the requester that it can appeal whatever portion of the 'determination' is adverse." *Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 711 F.3d 180, 188 (D.C. Cir. 2013).

24. In "unusual circumstances," including a "need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records," that deadline may be extended for a period not to exceed 10 additional business days. 5 U.S.C. § 552(a)(6)(B).

25. FOIA waives administrative exhaustion requirements and permits a requestor to sue in federal court without continued waiting for an agency response where an agency fails to comply with FOIA deadlines. 5 U.S.C. § 552(a)(4)(B), (a)(6)(C)(1).

## FACTUAL ALLEGATIONS

**The Three FOIA Requests.**

26. Professor Jordan submitted three distinct FOIA requests to Defendants on the following dates, with each accepted and assigned a FOIA reference number by Defendants: (a) a request for Melvin's custodial medical records, filed on March 13, 2023, reference 2023-ICFO-13655 ("**March 13 Medical Records Request**"); 2) a request for the official, headquarters-level OPR Detainee Death Review ("DDR") report and related documents, filed on April 13, 2023, reference 2023-ICFO-22448 ("**April 13 OPR DDR Request**"); and (c) a request for records pertaining to Defendants' efforts in response to the preceding two requests, as well as additional records related to Melvin's death, filed on May 17, 2023, reference 2023-ICFO-026638 ("**May 17 Follow-up Request**"). Details of each, and Defendants' failure to respond to each request, follow.

### a. March 13 Medical Records Request.

27. On March 13, 2023, Professor Jordan and law students under her supervision electronically filed (at ICE-FOIA@dhs.gov) a FOIA request with Defendant ICE seeking "**all medical records in DHS' possession pertaining to Mr. Calero Mendoza.**" (emphasis in original).

28. Professor Jordan and law students under her supervision made this request via email, as directed by Defendant ICE's website and Defendants' regulations, for the most rapid disposition. *See* 6 C.F.R. § 5.3. A true and correct copy of this request is attached as **Exhibit 1 at 1-5.**

29. This request included all necessary and specific information required to identify the subject-person, Melvin Calero Mendoza, including Melvin's date of birth and A-number (a standard identification code Defendants assigned to Melvin).

30. This request gave significant specificity to the records sought, including: 1) "[a]ny and all medical and mental health records from when Mr. Calero Mendoza entered DHS custody on April 13, 2022, until October 13, 2022, including but not limited to medical, dental and mental health intake screening conducted at the TCDF and Aurora facility, indications of preexisting conditions, any and all kite requests seeking medical assistance (both paper and electronically filed), records/notes/observations from any medical/mental health appointments, diagnoses, and medication(s) provided and/or prescribed; records of injuries and actions taken" and 2) "a copy of the death certificate for Mr. Calero-Mendoza."

31. This request also sought expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e)(1) and demonstrated that expedited processing was merited both by the facts of Melvin's case and by Defendants' own policies.

32. The request noted the following factors favoring expedited processing: 1) Defendants' own policy, which sets forth explicit responsibilities and clear, short timelines regarding gathering

and release of information after a detained person's death[1]; 2) vindication of the legal rights of Melvin's family, which depends on timely access to information about Melvin's death; 3) mitigation of an "imminent threat to the life of physical safety," *see* 6 C.F.R. § 5.5(e)(1), to other people detained by Defendants at ACDF, who could be threatened by the same circumstances that resulted in Melvin's sudden death; and 4) the existence of a "matter of widespread interest" that implicates "the government's integrity" and "affect[s] public confidence," *see* 6 C.F.R. § 5.5(e)(1)(iv). This latter factor is especially weighty given the continued public interest in and media scrutiny of the continued deaths in Defendants' immigration detention facilities.

33. On March 14, 2023, Professor Jordan and law students under her supervision received an email from ICE-FOIA@ice.dhs.gov in response to the March 13 Medical Records Request.

34. This email indicated that because the March 13 Medical Records Request lacked a "third party consent form" signed by the subject of the request – Melvin Calero Mendoza, notwithstanding the fact that the underlying March 13 Medical Records Request had clearly conveyed Melvin's death – the request "was not a proper FOIA request, and we are unable to accept your request."

35. The email directed Professor Jordan and law students under her supervision to "please re-submit the request" with a third-party consent form. *See* **Exhibit 1 at 10.**

---

[1] ICE Directive 11003.5, Notification, Review, and Reporting Requirements for Detainee Deaths (Oct. 25, 2021), accessed October 2, 2023, at https://www.ice.gov/doclib/detention/directive11003-5.pdf.

36.   On March 31, 2023, Professor Jordan and law students under her supervision responded and provided documentation under 22 CFR § 171.11 establishing their standing to make the request.

37.   On April 13, 2023, Professor Jordan and law students under her supervision sent a follow-up email to ICE-FOIA@ice.dhs.gov. The email indicated that the ten-day expedited processing timeline for Defendants' response to the March 13 Medical Records Request had passed and requested an immediate response from Defendants. *See* **Exhibit 1 at 7-8**.

38.   On April 15, 2023, ICE-FOIA@ice.dhs.gov replied, assigning the March 13 Medical Records Request a FOIA reference number (2023-ICFO-13655) and indicating that the request had been accepted. In the response, Defendant noted that the request would be processed "as expeditiously as possible," confirmed that a search for responsive records was underway, and apologized "for the delay you are experiencing." *See* **Exhibit 1 at 7**.

39.   On May 24, 2023, Professor Jordan and law students under her supervision sent a follow-up email to ICE-FOIA@ice.dhs.gov noting that the statutory timeline for Defendants' response to the March 13 Medical Records Request had passed and requesting a status update. *See* **Exhibit 1 at 6**.

40.   On May 25, 2023, Professor Jordan and law students under her supervision received a response indicating that the March 13 Medical Records Request was "pending the search for responsive documents." *See* **Exhibit 1 at 6**.

41.   As of the date of this filing, Defendants have not provided any additional response, or any records whatsoever, in response to Professor Jordan's March 13 Medical Records Request.

42. Even assuming that the Request was not received by Defendants until April 15, 2023, and further assuming that a ten-business-day extension was warranted, Defendants' response to Professor Jordan's March 13 Medical Records Request was due 30 business days from that date, or by mid-May 2023, pursuant to 5 U.S.C. § 552(a)(6)(A)(i) and (a)(6)(B).

43. Pursuant to 5 U.S.C. § 552(a)(4)(B) and (6)(C), Professor Jordan is deemed to have exhausted any and all administrative remedies with respect to the March 13 Medical Records Request (2023-ICFO-13655) because Defendants failed to comply within the time limit set forth in 5 U.S.C. § 552(a)(6)(A) and, therefore, constructively denied the request.

### b. April 13 OPR DDR Request.

44. On April 13, 2023, Professor Jordan and law students under her supervision electronically filed (at ICE-FOIA@dhs.gov) a FOIA request with Defendant ICE for all records "**pertaining to the Detainee Death Review Report of Mr. Calero Mendoza's Death performed by the Office of Professional Responsibility (OPR), External Reviews and Analysis Unit (ERAU), and/or the Office of Detention Oversight (ODO).**" (emphasis in original).

45. She and law students under her supervision sent this request via email, as directed by Defendant ICE's website and Defendants' regulations, for the most rapid disposition. *See* 6 C.F.R. § 5.3. A true and correct copy of this request is attached as **Exhibit 2 at 1-6.**

46. This request included all necessary and specific information required to identify the subject-person, Melvin Calero Mendoza, including Melvin's date of birth and A-number (a standard identification code Defendants assigned to Melvin).

47.  This request gave significant specificity to the records sought, including: 1) "[t]he official Detainee Death Review Report, released ~six months after Mr. Calero Mendoza's death, produced by any of the following departments: the Office of Professional Responsibility (OPR), External Reviews and Analysis Unit (ERAU), and/or the Office of Detention Oversight (ODO)" and 2) "[a]ny and all documentation cited by or relied upon the [preceding] offices in creation of the report, including but not limited to: medical, dental and mental health intake screening conducted at the TCDF and Aurora facility, indications of preexisting conditions, any and all kite requests seeking medical assistance (both paper and electronically filed), records/notes/observations from any medical/mental health appointments, diagnoses, and medication(s) provided and/or prescribed; records of injuries and actions taken."

48.  ICE Directive 11003.5 is a policy that governs documentation of and notifications about deaths in ICE's detention system.[2] This Directive defines two different death report documents that ICE must generate.

49.  The first death report, per Sections 3.2 and 5.1(3)(c) of the Directive, is ICE's Office of Public Affairs (OPA)'s preliminary "**Detainee Death Report**," which must be posted within 48 hours of the detained person's death. This "Detainee Death Report" for Melvin, which is

---

[2] ICE Directive 11003.5, Notification, Review, and Reporting Requirements for Detainee Deaths (Oct. 25, 2021), *§ 5.3 Notification to Congress and the Public and Preparation of Statements in Response to Press Inquiries*, accessed October 2, 2023, at https://www.ice.gov/doclib/detention/directive11003-5.pdf.

comprised of a three-page chronology, is publicly available and, on information and belief, has been for nearly a year.[3]

50. By contrast, Sections 3.5 and 5.1(7)(b) define and lay out the procedure for the second mandatory death report — an "**OPR Detainee Death Review**" to be completed within 180 days of a detained person's death. *See* 5.1(7)(b). Per the Directive, OPR is to complete an objective examination of the facts and circumstances of a detained person's death to determine whether they received treatment consistent with the agency's detention standards. *See* 3.5. The results of OPR's examination are documented in the OPR Detainee Death Review.

51. This request also sought expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e)(1) and demonstrated that expedited processing was merited for the same reasons as in Professor Jordan's March 13 Medical Records Request.

52. In addition, with respect to this April 13 OPR DRR Request, Defendants' own policy explicitly requires Defendants, "No later than 180 days of the detainee death," to complete the OPR DDR. In other words, it should have been complete by the time the request was made, and so Plaintiff and students under her supervision requested its expedited production (emphasis in original).[4]

53. On Apil 25, 2023, Professor Jordan and law students under her supervision received an email from Defendants with the subject line "ICE FOIA 2023-ICFO-22448," which acknowledged

---

[3] U.S. Immigration and Customs Enforcement, Detainee Death Report: Mendoza, Melvin Ariel Calero, accessed October 13, 2023, at
https://www.ice.gov/doclib/foia/reports/ddrMendozaMelvinArielCalero.pdf

[4] ICE Directive 11003.5 at 5.1(7).

receipt of the April 13 OPR DRR Request as of April 13, 2023. This email summarily denied Plaintiff's request for expedited processing of the April 13 OPR DDR Request. *See* **Exhibit 2 at 10-13**.

54. On April 28, 2023, Professor Jordan and law students under her supervision appealed Defendants' denial of expedited processing via email to GILDFOIAAppeals@ice.dhs.gov, as directed by Defendants' instructions for administrative appeals.

55. In the appeal, Professor Jordan and law students under her supervision set forth in detail the factors requiring expedited process of Plaintiff's April 13 OPR DDR Request, including 1) that one of the records sought, a single document created by OPR, by Defendants' own policies, was already complete and available, rebutting Defendants' contention that the Plaintiff's April 13 OPR DRR Request would require a wide-ranging search; 2) the urgency to inform both Melvin's family and the public of what happened to Melvin while in Defendant's custody, 6 C.F.R. § 5.5(e)(1)(i) (federal government activity); and 3) the intense media, Congressional, and public interest in Melvin's death, 5 U.S.C. §552(a)(2)(D).  *See* **Exhibit 3 at 1-2**.

56. On May 29, 2023, Professor Jordan received an email attaching a letter from Defendant ICE's Office of the Principal Legal Advisor ("OPLA") denying her appeal. In this letter, Defendants gave bureaucratic and conclusory reasons that did not appear to reflect an awareness of Professor Jordan's reasons supporting her initial request for expedited treatment. *See* **Exhibit 3 at 3-5**.

57.  Apart from Defendants' bureaucratic and conclusory reasoning, Defendants also falsely asserted that Defendants have already produced one of the records Professor Jordan requested — Melvin's OPR Detainee Death Review.

58.  Defendants included a link at which Defendants claimed the requested document had already been published. The document at this link — a three-page document giving minimal information about Melvin's death — is titled "Detainee Death Report." It appears to be the first, brief mandatory death report Defendants must produce pursuant to ICE Directive 11003.5 section 3.2. It *is not* the full Detainee Death Review created by OPR (as required by ICE Directive 11003.5 section 3.5) that Professor Jordan requested.

59.  To illustrate the difference between the two mandatory death reports, OPR completed a Detainee Death Review for a man named Kamyar Samimi in March 2018, who died in Defendants' custody — also at the ACDF — on December 2, 2017.

60.  Mr. Samimi's OPR Detainee Death Review followed the format described in ICE Directive 11003.5 section 3.5 and included copious detail. Indeed, Mr. Samimi's OPR DDR was approximately 130 pages, in contrast to the three-page document Defendants cited in their May 29 email to Professor Jordan.[5]

61.  On information and belief, a full (ICE Directive 11003.5 section 3.5) OPR Detainee Death Review for Melvin — *not* the preliminary DDR inaccurately cited by Defendants — was completed by Defendants' Office of Professional Responsibility's External Reviews and Analysis Unit (ERAU) at the end of March 2023. This full OPR Detainee Death Review for

---

[5] U.S. Immigration and Customs Enforcement, External Reviews and Analysis Unit Detainee Death Review Kamyar Samimi, accessed October 13, 2023, at https://s3.documentcloud.org/documents/6044545/ICE-Review-Samimi.pdf

Melvin has not been provided by Defendants at any time and is what Professor Jordan's request indicated she seeks.

62. On May 17, 2023, Professor Jordan sent a follow-up email to Defendants on the same email chain. The email reiterated Plaintiff's specific request for Melvin's OPR Detainee Death Review and indicated both that the DDR was completed and only available via FOIA. The email asked for an estimated date of production. *See* **Exhibit 2 at 9-10**.

63. On May 17, 2023, Professor Jordan received an email response indicating that her April 13 OPR DRR Request was "currently in queue to be processed" and gave an "estimated completion date" of June 1, 2023. *See* **Exhibit 2 at 9**.

64. On July 10, 2023, Professor Jordan sent a follow-up email on the same chain noting that it was "now well over a month since the estimated completion date" and "well past the time for completion" required by FOIA and emphasizing that the record was just "a single document." *See* **Exhibit 2 at 8-9**.

65. On July 14, 2023, Professor Jordan received an email response that indicated that her April 13 OPR DRR Request was "currently pending." *See* **Exhibit 2 at 8**.

66. On July 17, 2023, Professor Jordan responded to ask again for an "estimated date of production." *See* **Exhibit 2 at 7-8**.

67. On July 24, 2023, Professor Jordan received an email response indicating that her April 13 OPR DRR Request was "currently being processed by an analyst." *See* **Exhibit 2 at 7**.

68. As of the date of this filing, Defendants have not provided any additional response, or any records whatsoever, in response to the April 13 OPR DRR Request.

69. Even assuming that a ten-business-day extension was warranted, Defendants' response to Professor Jordan's April 13 OPR DRR Request was due 30 business days from that date, or by the end of May 2023, pursuant to 5 U.S.C. § 552(a)(6)(A)(i) and (a)(6)(B).

70. Pursuant to 5 U.S.C. § 552(a)(4)(B) and (6)(C), Plaintiff is deemed to have exhausted any and all administrative remedies with respect to the April 13 OPR DRR Request (2023-ICFO-22448) because Defendants failed to comply within the time limit set forth in 5 U.S.C. § 552(a)(6)(A) and, therefore, constructively denied the request.

### c.     May 17 Follow-up Request.

71. On May 17, 2023, Professor Jordan electronically filed at Defendant ICE's online FOIA submission portal[6] a third FOIA request. *See* **Exhibit 4 at 1.**

72. This request specified three sets of records sought, including: 1) all records created by Defendants in response to the March 13 Medical Records Request and the April 13 OPR DRR Request, including all tasking and correspondence related to these same; 2) all documents in Defendants' possession related to Melvin's death and Defendants' investigation of his death, including an enumerated list of specific documents Defendants typically create, maintain, possess, and control following the death of a detained person; and 3) all records regarding other FOIA requests (other than Professor Jordan's three requests) relating to Melvin and / or conditions at ACDF filed since October 2022.

---

[6] U.S. Immigration and Customs Enforcement, *Freedom of Information Act (FOIA)*, https://www.ice.gov/foia (last visited October 13, 2023) ("Request ICE records online").

73.   On June 6, 2023, Professor Jordan received an email from Defendants with the subject line "ICE FOIA 2023-ICFO-26638," which acknowledged receipt of the May 17 Follow-up Request as of May 17, 2023. *See* **Exhibit 4 at 2-3.**

74.   As of October 2, 2023, according to the online FOIA status tracker maintained by Defendants,[7] the status of Professor Jordan's May 17 Follow-up Request is "Searching for Records." *See* **Exhibit 4 at 4.**

75.   As of the date of this filing, Defendants have not provided any additional response, or any records whatsoever, in response to the May 17 Follow-up Request.

76.   Even assuming that a ten-business-day extension was warranted, Defendants' response to the May 17 Follow-up Request was due 30 business days from that date, or by mid-June 2023, pursuant to 5 U.S.C. § 552(a)(6)(A)(i) and (a)(6)(B).

77.   Pursuant to 5 U.S.C. § 552(a)(4)(B) and (6)(C), Professor Jordan is deemed to have exhausted any and all administrative remedies with respect to the May 17 Follow-up Request (2023-ICFO-026638) because Defendants failed to comply within the time limit set forth in 5 U.S.C. § 552(a)(6)(A) and, therefore, constructively denied the request.

**There Is Widespread and Strong Public Interest in Melvin's Death, Defendants' Detention Practices, and Defendants' Pattern and Practice of FOIA Violations.**

78.   Professor Jordan submitted these three FOIA requests against a backdrop of widespread and ongoing public concern about Defendants' harmful immigration detention practices, including many deaths in immigration detention. This backdrop demonstrates how Plaintiff's requested records relate to imminent threats to the life or physical safety of people detained

---

[7] U.S. Immigration and Customs Enforcement, *Freedom of Information Act (FOIA)*, https://www.ice.gov/foia (last visited October 2, 2023) ("Check status of request").

by Defendants; show urgency to inform the public about Defendants' harmful detention practices; illustrate the loss of substantial due process rights suffered by people detained by Defendants; and concern matters of widespread media interest and raise sharp questions about public confidence in Defendants.

79.  This backdrop also underscores the fundamental interests at stake in vindicating both the public's right to access Defendants' records "to check against corruption and to hold the governors accountable to the governed," *NLRB, supra.,* and the particular right that Melvin's family has, via Professor Jordan, to information surrounding their loved one's sudden death while in Defendants' custody.

80.  Indeed, Melvin's death has proven to be of substantial public interest. Members of Colorado's Congressional delegation have repeatedly and publicly written to ICE and issued statements about his death, most recently to exhort the agency to comply with its FOIA obligations and respond to outstanding requests for the OPR DDR completed in his case.

81.  Numerous local, national, and international radio, print, and television news outlets have covered his death extensively.[8]

82.  Unfortunately, Melvin's death is not an outlier.  In 2021, medical researchers at the University of Southern California examined 55 OPR DDRs from deaths in ICE detention between 2011

---

[8] *E.g.*, Matt Bloom, *Aurora ICE death autopsy released, raises questions about medical care in federal detention centers*, CPR News (Feb. 15, 2023, 8:44 pm), https://www.cpr.org/2023/02/15/aurora-ice-inmate-deaths; Matt Bloom, *Independent autopsy of death at Aurora ICE facility confirms man died of embolism tied to untreated injury*, CPR News (April 18, 2023, 1:34pm), https://www.cpr.org/2023/04/18/aurora-ice-facility-calero-mendoza-death-coroners-report/; Matt Bloom, *Colorado senators, congressman push for report on death at Aurora facility after ICE misses deadline*, CPR News (Sep. 14, 2023, 2:37 pm), https://www.cpr.org/2023/09/14/colorado-senators-congressman-report-death-aurora-facility-ice-misses-deadline/.

and 2018 and documented persistent themes of delays in care, grossly substandard care, and failures of emergency response across those deaths. They concluded that many of the deaths they examined were likely preventable and that ICE had violated its own medical standards in "the vast majority of cases."[9]

83. The federal government itself has also sharply criticized ICE's failure to comply with its own standards in the death of a detained person. For example, the 2017 OPR DDR for Kamyar Samimi, who died at ACDF like Melvin, identified twelve areas of non-compliance with ICE detention standards, including the inability to reach the on-call physician during Mr. Samimi's medical emergency, the failure to transfer Mr. Samimi to an emergency room even though he exhibited life threatening symptoms, understaffing, and the failure to administer medication and properly document it.

84. In addition, OPR dedicated five pages of its report to additional "areas of concern" where the conduct of the facility was not consistent with detention standards in Mr. Samimi's case. Finally, OPR noted two internal initial reviews conducted by The GEO Group, the private contractor co-operating the ACDF with Defendants, that found that there were no major problems with the care they had provided to Mr. Samimi.

85. These deaths take place against the larger backdrop of concerns about inadequate care in facilities throughout ICE's detention system, not always resulting in death. For example, in a 2019 systemwide challenge to ICE's failure to provide adequate care to detained people, plaintiffs in *Fraihat v. ICE* filed a complaint that spanned 200 pages citing dozens of

---

[9] Parveen Parmar et al., *Mapping factors associated with deaths in immigration detention in the United States, 2011-2018: A thematic analysis*, The Lancet Regional Health Americas, Vol. 2 (October 2021).

government and civil society reports on ICE's inadequate care and failure to adhere to their own detention standards over many years.

86. As but a few specific examples of the government's own agencies documenting ICE deficiencies, Defendant DHS's Office of Inspector General (OIG) has, with respect to the Torrance County Detention Facility in New Mexico where Melvin also was detained, reported that "we found such egregious conditions in the facility that we issued a management alert . . . and recommended . . . the immediate relocation of all Torrance detainees unless and until the facility ensures adequate staffing and appropriate living conditions" and finding that "Torrance medical care did not always meet standards").[10]

87. With respect to the Adelanto ICE Processing Facility in Adelanto, California, OIG found numerous failures that persisted even after "a detainee death review" of a March 2017 suicide "previously identified similar issues."[11]

88. This widespread and ongoing public concern about and media scrutiny of Defendants' harmful immigration detention practices extend to ACDF — the same facility where Melvin died. In 2019, the ACLU of Colorado released a comprehensive report examining the "atrocious conditions at ACDF," criticizing the lack of appropriate medical, mental health, and other necessary services at ACDF, and outlining the perverse financial incentives that

---

[10] U.S. Department of Homeland Security Office of Inspector General, Violations of ICE Detention Standards at Torrance County Detention Facility (September 28, 2022), accessed October 13, 2023, at https://www.oig.dhs.gov/sites/default/files/assets/2022-09/OIG-22-75-Sep22.pdf.

[11] U.S. Department of Homeland Security Office of Inspector General, Violations of ICE Detention Standards at Torrance County Detention Facility (September 27, 2018), accessed October 13, 2023, at https://www.oig.dhs.gov/sites/default/files/assets/Mga/2018/oig-18-86-sep18.pdf.

resulted in the expansion of Defendant ICE's contract with The GEO Group, even as questions about GEO's mismanagement, medical negligence, and other legal violations mounted.[12]

89.   The report underscores the wide public attention to abysmal conditions at ACDF, quoting, for example, a letter from then-Representative Jared Polis (now Governor of Colorado) conveying "grave concern" over "grossly unacceptable and inadequate medical and mental health services faced by detainees"[13] at ACDF. Concern about inadequate medical and mental health care at ACDF were sufficiently severe and publicly known that a coalition of national organizations, the American Immigration Council (Council) and the American Immigration Lawyers Association (AILA), complained to Defendant DHS's Office of Civil Rights and Civil Liberties about ACDF over the same.[14]

90.   DHS's OIG also raised concerns about conditions at ACDF during the same period.[15]

91.   A recent August 2023 report from National Public Radio (NPR) crystallizes, in chilling and urgent detail, the widespread and ongoing public concern about Defendants' harmful

---

[12] ACLU of Colorado, *Cashing In On Cruelty, Stories of death, abuse, and neglect at the GEO immigration detention facility in Aurora* (2019), accessed October 2, 2023, at https://www.aclu-co.org/sites/default/files/ACLU_CO_Cashing_In_On_Cruelty_09-17-19.pdf.
[13] *Id.*, p.12.
[14] American Immigration Counsel, *Complaint Filed with DHS Oversight Bodies Calls for Improvements to Medical and Mental Health Care of Immigrants in Aurora Detention Center*, accessed October 2, 2023, at https://www.americanimmigrationcouncil.org/news/complaint-filed-dhs-oversight-bodies-calls-improvements-medical-and-mental-health-care.
[15] U.S. Department of Homeland Security Office of Inspector General, Concerns about Detainee Treatment and Care at Four Detention Facilities (June 2019), accessed October 13, 2023, at https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf (describing the inappropriate segregation practices in the Aurora facility, identifying "serious issues with the administrative and disciplinary segregation" used, describing the lack of outdoor space or opportunity for recreation provided, and lack of contact visitation with loved ones).

immigration detention practices and the most prominent themes that continue to be the focus of public scrutiny.[16]

92. The same reporting also highlights two deaths at the ACDF – that of Mr. Samimi, who died at ACDF on December 2, 2017, and Melvin's death.

93. The August 2023 NPR investigation is the result of a three-year legal effort to obtain internal government inspection records of Defendants' immigration detention facilities.

94. According to NPR, it first requested the inspection reports under FOIA in 2019, but Defendants "initially refused to provide a single page of the documents."

95. After "exhausting the FOIA appeals process, NPR filed a lawsuit against Defendant DHS in September 2020."

96. In 2022, a federal judge found that Defendant DHS had violated FOIA and ordered 1600 pages of inspection reports produced to NPR. The 1600 pages show what "the government's own experts" called "barbaric" and "negligent" conditions across scores of Defendants' immigration detention facilities.

97. In reviewing the 1600 pages, NPR identified key themes, including that "[i]nadequate medical care posed the most serious problem in ICE detention" and that "the government

---

[16] Tom Dreisbach, *NPR Investigation Reveals 'Barbaric' Conditions in ICE Detention Facilities,* National Public Radio (August 17, 2023) (13-minute audio report), https://www.npr.org/2023/08/14/1193771612/npr-investigation-reveals-barbaric-conditions-in-ice-detention-facilities; Tom Dreisbach, *A 'shocking' 911 call and other key takeaways from NPR's ICE detention investigation,* National Public Radio (August 24, 2023), https://www.npr.org/2023/08/14/1193771612/npr-investigation-reveals-barbaric-conditions-in-ice-detention-facilities; Tom Dreisbach, *Government's own experts found 'barbaric' and 'negligent' conditions in ICE detention,* National Public Radio (August 16, 2023), https://www.npr.org/2023/08/16/1190767610/ice-detention-immigration-government-inspectors-barbaric-negligent-conditions (together, "NPR Reports").

[including Defendant DHS] violated the law by trying to keep ICE inspection records secret."[17]

98. The NPR report also described internal inspection reports regarding the death of Mr. Samimi. The chilling content of these records stands in sharp contrast to the GEO Group and Defendants' initial position that they had acted appropriately.

99. The NPR Report powerfully concludes with an examination of another death at the ACDF – Melvin's. The examination sharply raises more questions than it answers and underscores the importance of the relief sought in the instant case. The NPR Report analyzes audio from the 911 call made from ACDF the day of Melvin's death, and as NPR notes, the audio "reveals confusion, gaps in communication, and wasted time with someone's life on the line."[18]

100. With such abject failures as these revealed — along with the additional questions they raise, including how life-saving information was omitted during Melvin's 911 call — it is no surprise that Defendant DHS fought NPR's FOIA lawsuit to uncover these records, just as Defendants are now stonewalling Professor Jordan.

101. NPR and Professor Jordan are not the only members of the public for whom Defendants ignore their legal obligations under FOIA.

102. In 2021, the public interest group American Oversight sued Defendants for detainee death reviews and health care records completed between 2018 and 2021, the sorts of records

---

[17] *Id.*
[18] NPR Reports, *supra.*

Professor Jordan seeks here. American Oversight alleged Defendants failed to respond to any of its FOIA requests.[19]

103. In 2019, the American Immigration Council, with partners National Immigration Litigation Alliance, Northwest Immigrant Rights Project, and Law Office of Stacy Tolchin, filed suit in the Northern District of California contesting Defendant ICE's routine FOIA violations. That case remains pending.

104. In this district alone, Defendants are party to numerous lawsuits alleging their failure to comply with their legal obligations under FOIA.

105. Often, Defendants refuse to comply with the law until a requestor initiates a civil action, resulting in increased time and cost and unnecessary burdens on the federal judiciary.

106. The ACLU of Colorado, for example, faced two years of Defendant ICE's intransigence on releasing the Detainee Death Review Report for Mr. Samimi and then had to file a FOIA lawsuit, which resulted in the release of responsive records a month later.

107. Professor Jordan herself previously had to sue ICE in 2018 for records relating to detention conditions and deaths at ACDF and several other ICE facilities in *CREEC v. ICE*, resulting in the release of responsive records under the supervision of Judge Matsch.

108. And just last month, local nonprofit Rocky Mountain Immigrant Advocacy Network (RMIAN) had to sue Defendant ICE for documents related to detention conditions at ACDF and Melvin's death, specifically.

---

[19] *American Oversight v. U.S. Department of Homeland Security et al.*, Compl., Novvember 16, 2021, accessed October 13, 2023, at https://www.documentcloud.org/documents/21111352-american-oversight-v-dhs-and-ice-records-concerning-deaths-of-detainees-in-federal-custody

109. Federal courts in cases granting FOIA relief against Defendants have noted and denounced Defendants' pattern and practice playbook of delay, ignore, and refuse. *See, e.g.*, *Transgender L. Ctr. v. ICE*, 46 F. 4th 771, 777 (9th Cir. 2022) ("Here the advocates' FOIA requests met first with silence and then with stonewalling; only after the advocates filed suit did the government begin to comply with its statutory obligations."); *Owen v. ICE*, 2:22-cv-00550, at 16 (C.D. Cal. January 12, 2023) ("The particularly troublesome pattern is that, almost across the board and regardless of when the initial request was filed, ICE did not provide any response or any documents until after litigation was filed"; granting 'pattern and practice' declaratory relief against Defendant ICE; noting that "it should not take a lawsuit to for an agency to comply with FOIA").

110. These examples demonstrate Defendants' pattern and practice of FOIA violations regarding detention records. Given this pattern and practice, it is unlikely that Defendants will produce any records responsive to Professor Jordan's requests unless this Court holds Defendants to their FOIA obligations.

## CLAIMS FOR RELIEF

### COUNT 1
### 5 U.S.C. § 552(a)(6)(A) – Failure to Timely Issue a Determination in Response to Plaintiff's FOIA Requests

111. Plaintiff realleges and incorporates by reference all allegations of this Complaint here.

112. Under FOIA, 5 U.S.C. § 552(a)(6)(A)(i), Defendants must "immediately notify" (within twenty business days) the requestor of its determination whether it will comply with a FOIA request and the reasons for that determination.

113. Within that time, Defendants "must at least: (i) gather and review the documents; (ii) determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform the requester that it can appeal whatever portion of the 'determination' is adverse." *Citizens for Resp. and Ethics in Wash. v. Fed. Election Comm'n*, 711 F.3d 180, 188 (D.C. Cir. 2013) (CREW).

114. Here, Defendants have failed to provide a determination with for any of Professor Jordan's three FOIA requests within the statutorily required time periods in violation of 5 U.S.C. § 552(a)(6)(A)(i).

115. Plaintiff is therefore entitled to an order requiring ICE to immediately issue an appropriate determination in response to each of Professor Jordan's requests, as described herein.

## COUNT 2
### 5 U.S.C. §552(a)(6)(E) and 6 C.F.R. § 5.5(e) – Failure to Timely Respond to Plaintiff's Requests for Expedited Processing and to Expedite Processing of Plaintiff's FOIA Requests

116. Professor Jordan realleges and incorporates by reference all allegations of this Complaint here.

117. Under 5 U.S.C. §552(a)(6)(E)(ii)(I) and 6 C.F.R. §5.5(e), Defendants must within ten days notify a requestor of its determination whether to grant or deny expedited processing of a request.

118. Defendants must expedite processing of requests that involve (1) circumstances that "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual"; (2) "[a]n urgency to inform the public about an actual or alleged federal government activity"; (3) "[t]he loss of substantial due process rights"; or (4) "[a] matter of widespread and exceptional media interest in which there exist possible questions about the

government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(i)-(iv). Defendants must give expedited requests priority and process them "as soon as practicable." 6 C.F.R. § 5.5(e)(4); see 5 U.S.C. § 552(a)(6)(E)(iii)).

119. Defendants failed to provide any determination in response to Professor Jordan's request for expedited processing in connection with the March 13 Medical Records Request in violation of FOIA, 5 U.S.C. § 552(a)(6)(E)(ii)(I), and corresponding DHS regulations, 6 C.F.R. § 5.5(e)(4).

120. Even where Defendants did provide such determination, Defendants erroneously denied expedited processing in connection with the April 13 DDR Request.

121. Thus, Defendants unlawfully failed to provide expedited processing in connection with the March 13 Medical Records Request and the April 13 DDR Request in violation of 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e)(1)(i)-(iv).

122. Accordingly, Professor Jordan is entitled to an order requiring ICE to immediately expedite processing of the March 13 Medical Records Request and the April 13 DDRR Request.

**COUNT 3**
**5 U.S.C. § 552(a) - Failure to Reasonably Search for and**
**Promptly Produce Responsive Records**

123. Professor Jordan realleges and incorporates by reference all allegations of this Complaint here.

124. Under FOIA, 5 U.S.C. § 552(a)(3), Defendants must reasonably search for and "promptly" produce records responsive to a FOIA request and provide lawful reasons for withholding any materials as to which it claims an exemption. Typically, "promptly" means "within days

or a few weeks of a 'determination' [under 5 U.S.C. § 552(a)(3)(A), (a)(6)(C)(i)], not months or years." *CREW*, 711 F.3d at 188.

125. As of the date of this Complaint, Defendants have not reasonably searched for, and have failed to produce any responsive records, or any records at all, to any of Professor Jordan's three requests. Defendants have not invoked any FOIA exception, and none apply.

126. Even if one or more exemptions did apply to certain portions of the requested records, Defendants must disclose any reasonably segregable non-exempt portions. 5 U.S.C. § 552(a)(8)(A)(ii)(II).

127. And even if Defendants determine that any or all of the agency documents Plaintiff has requested are somehow exempt, Defendants are required to inform Plaintiff of that determination and the reasons for the same.

128. Defendants have violated 5 U.S.C. § 552(a)(6)(A) by failing to timely respond to Professor Jordan's requests, and as a result, may not charge Professor Jordan any retrieval fees, duplication charges, or review fees as a condition of providing the requested records. 5 U.S.C. § 552(a)(4)(A)(viii).

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF respectfully requests that this Court enter judgment in her favor and against Defendants, and:

a. declare that Defendants' withholding of the requested records is unlawful, and permanently enjoin the same;

b. declare that Defendants have engaged in a pattern and practice of FOIA violations, and permanently enjoin the same;

c.    order Defendants to make the requested records available to Plaintiff;

d.    enjoin Defendants from imposing any retrieval fees or duplication costs as a condition of providing the requested records;

e.    order Defendants to produce a *Vaughn* index describing with particularity the content of any documents withheld, in whole or in part, and identifying the FOIA exemptions Defendants assert to justify such withholding;

f.    award Plaintiff its costs and reasonable attorneys' fees in accordance with 5 U.S.C. § 552(A)(4)(E); and

g.    order such other and further relief as the Court may deem just and proper.

DATED this 13th day of October, 2023

Respectfully submitted,

*s/ Aaron Slade*
Aaron Slade, Esq.
NOVO LEGAL GROUP, LLC
4280 Morrison Rd., Denver, CO 80219
Telephone: 303-335-0250
Fax: 303-296-4586
Email: aslade@novo-legal.com

*/s/ Danielle Jefferis*
Danielle Jefferis, Esq.
NOVO LEGAL GROUP, LLC
4280 Morrison Rd., Denver, CO 80219
Telephone: 303-335-0250
Fax: 303-296-4586
Email: danielle@novo-legal.com

**Attorneys of Record for Plaintiff Elizabeth Jordan**

Gregory Pleasants, Esq.
GREGORY PLEASANTS LAW, APC
1075 N Tustin St. #4625
Orange, CA 92863
Telephone: 657-561-5886

Email: gregory@gregorypleasantslaw.com

*Associated Counsel\**

\*Admitted only in CA; associated counsel on pleadings only